UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

BRUCE BIRCH,

Plaintiff,

v.

DWIGHT NEVEN,

Defendant.

Case No. 2:11-cv-00516-GMN-CWH

ORDER

This counseled habeas petition is before the court for a decision on the merits (ECF No. 71).

## I.    Procedural History and Background

In his amended petition, petitioner Birch challenges three separate criminal convictions (ECF No. 71).  Birch was charged with conspiracy to commit burglary in Case No. CR07-1714A (the Home Depot case), for allegedly attempting to steal various items from a Home Depot store in June, 2007.  He was charged with burglary in Case No. CR08-1585 (the Sears case), for allegedly stealing several wrenches from a Sears store on February 21, 2008.  And he was charged with possession of a stolen Ford truck in a Walmart parking lot on February 21, 2008, in Case No. CR08-1586 (the Ford truck case).

Birch pled guilty in the Home Depot case (exhibits to first amended petition, ECF No. 71, exhs. 14, 15)[1] and went to trial on the Sears and Ford truck cases.  A jury found

---

[1] The exhibits referenced in this order are exhibits to the first amended petition, ECF No. 71 and are found at ECF Nos. 72-77, unless otherwise noted.

1

Birch guilty in both cases.  Exhs. 113, 114.  On March 27, 2009, the state district court conducted a sentencing hearing on all three convictions.  Exh. 111.  The court adjudicated Birch a habitual criminal and sentenced him as follows:  in the Home Depot case, to a term of 19 to 48 months; in the Sears case, to a term of life without the possibility of parole, consecutive to the Home Depot sentence; and in the Ford truck case, to a term of life without the possibility of parole, concurrent to the Sears sentence. *Id.* at 41-42; Exhs. 112–114.  The three judgments of conviction were entered that same day.  Exhs. 112–114.

Birch appealed the three convictions and filed three separate appellate briefs.  Exhs. 116, 118, 120, 153, 155, 156.  The Nevada Supreme Court consolidated the appeals and affirmed the three convictions on March 11, 2010.  Exh. 163.  Remittitur issued on April 7, 2010.  Exhs. 164-166.  Birch did not file a state postconviction petition.

This Court granted respondents' motion to dismiss in part (ECF No. 89) and Birch elected to abandon his unexhausted claims (Exh. 90).  Respondents have answered the remaining grounds (ECF No. 94), and Birch filed a counseled reply (ECF No. 98).

## II.   Legal Standard under the Antiterrorism and Effective Death Penalty Act (AEDPA)

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state

court's application of clearly established law must be objectively unreasonable.  *Id.* (quoting *Williams*, 529 U.S. at 409).

In determining whether a state court decision is contrary to federal law, this court looks to the state courts' last reasoned decision.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Further, "a determination of a factual issue made by a state court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

### III.  Instant Petition

#### a.  Sixth Amendment Right to Counsel Claims

**Ground 1**

Birch asserts as ground 1A that he was denied his Sixth Amendment right to conflict-free counsel because an actual conflict of interest between Birch and his counsel existed (ECF No. 71, pp. 22-34).  In ground 1B, petitioner claims that the trial court violated his Sixth Amendment rights by failing to grant his motion for substitute counsel based on a breakdown in the attorney-client relationship.  *Id.* at 22, 34-35).

The Sixth Amendment right to counsel encompasses a right to representation free from conflicts of interest.  *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir.2004).  To establish a violation of the right to conflict-free counsel, the petitioner must show either that (1) in spite of an objection, the trial court failed to allow him the "opportunity to show that potential conflicts impermissibly imperil his right to a fair trial;" or (2) that an actual conflict of interest existed.  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Alberni v. McDaniel*, 458 F.3d 860, 869-870.

In several cases in which the United States Supreme Court has defined the right to conflict-free counsel, the defense attorney actively and concurrently represented conflicting interests.  *Mickens v. Taylor*, 535 U.S. 162, 166-167 (2002) (discussing earlier authority); *see also Holloway v. Arkansas*, 435 U.S. 475 (1978) (attorney representing co-defendants); *Cuyler*, 446 U.S. at 337-38 (same).  In those cases, the

4

Court created, in effect, a distinction between an actual conflict of interest, and a mere hypothetical one.  Indeed, in *Mickens*, the Court held that "actual conflict" is defined by the effect a potential conflict had on counsel's performance, explaining that:  "an actual conflict of interest [means] precisely a conflict that affected counsel's performance-as opposed to a mere theoretical division of loyalties."  *Id.* at 171; 172 n. 5 ("[W]e have used 'conflict of interest' to mean a division of loyalties that affected counsel's performance.").

With respect to a breakdown in the attorney-client relationship, the Supreme Court has made it clear that the Sixth Amendment guarantee of counsel does not guarantee a meaningful attorney-client relationship.  *Morris v. Slappy*, 461 U.S. 1, 14 (1983).  The Ninth Circuit has noted that if a conflict is of an indigent defendant's own making, that is if he or she sabotaged the attorney-client relationship or failed to make reasonable efforts to develop the relationship, he may still have "received what the Sixth Amendment required in the case of an indigent defendant."  *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).

The following problems between Birch and several attorneys who attempted to represent him are reflected by the record and set forth both in Birch's amended petition and respondents' answer (ECF Nos. 71, 94).  Birch was initially represented by Mazie Pusich in the three cases.  Pusich filed a motion for competency evaluation in March 2008 and related that:

> One evening [Birch] left rambling, incoherent and profane messages on several public defender phones. He appeared to have called every number between our receptionist and our fax machine. There are over fifty numbers. The vast majority of these employees did not know Mr. Birch or his case, and had no idea why he was calling to yell and swear at them.

Exhs. 23, 24.

The state district court granted the motion for a competency evaluation.  Exh. 26. Two psychiatric professionals evaluated Birch, and both found him competent to stand trial.  Exh. 30.  In June 2008, Pusich informed the court of a possible conflict of interest

with Birch.  Birch also asked for new counsel, stating that he was in bitter conflict with

Pusich.  Exh. 38.  The court granted Birch's request and appointed John Oakes as

counsel in July 2008.

On July 21, 2008, Judge Jerome Polaha recused himself from Birch's case

because Birch sent him a threatening letter:

> As presiding judge over this matter, I am compelled to recuse myself
> from further involvement with it based upon an event that I consider an
> implied threat from the defendant.  An ex-parte letter was delivered to my
> chambers from the defendant in which he advised that he was aware of
> my personal residence and he set it out in the letter.  I took that as an
> implied threat to the point that I advised court security about it.

Exh. 48.

The case was reassigned to Judge Patrick Flanagan, who presided over the

three cases.  Exh. 52.  In September 2008, John Oakes filed a motion to withdraw

based on Birch's "outrageous" conduct and "a complete breakdown of the attorney-

client relationship."  Exh. 61.  Oakes explained:  "Mr. Birch has left numerous

threatening messages on the office voice mail and has threatened counsel personally."

*Id.*  The state district court granted the motion to withdraw and appointed attorney

Robert Lindsay.  Exh. 65.

By October 2008, Birch accused Lindsay of acting on behalf of the district

attorney and called Lindsay a "pathological liar"; Birch also demanded a fourth attorney.

Exh. 73.  At an October 24, 2008 hearing, Lindsay stated that he had "the inability to

deal with this man and that's the simple and short of it."  Exh. 74, p. 5.  While Lindsay

did say that he believed that the court would have to appoint another attorney for Birch

at some point, he also commented that

> I believe [Birch] wants a different lawyer, and I've been kind of
> opposing that, because I believed at some point, I would end up just being
> able to deal with him and go forward.  But it's just really fairly ridiculous . . .
> . But he should at some point realize there's no other lawyer coming.

*Id.* at 7-8.

At that hearing, Birch told the court that he had been unable to call Lindsay, when Lindsay visited him at the jail he screamed at him and threatened him, and that their relationship had "deteriorated to the point beyond help." *Id.* at 10. Lindsay responded, stating that clients have been able to call him from the jail for thirty-five years. *Id.* at 14. The court denied the motion to withdraw. *Id.* at 12.

On January 9, 2009, the state district court held a hearing to confirm trial dates of January 20 and 26, 2009. Exh. 78. At that hearing, Birch claimed that he would be inheriting some money from his mother's estate and that he would know the details within two weeks. *Id.* at 7-8. Birch stated that depending on the sum he would either hire counsel or hire an investigator "to prove the allegations I made to the [state] bar and get [Lindsay off the case]." *Id.* at 8. He asked to continue the trials or appoint new counsel. The court denied the request. *Id.* Birch, who has admitted he is hepatitis C positive, then spit in Lindsay's face and eye. Exh. 97. The court ordered Birch removed from the courtroom. Exh. 78, p. 8. Lindsay then stated for the record: "I will do absolutely everything I can to defend this man. . . . I understand he's unhappy with me and he was unhappy with previous counsel and he's going to be unhappy with next counsel . . . . [I will] try to defend him the very, very best I can." *Id.* at 8-9.

Next, on January 14, 2009, the court held a hearing with Lindsay and the district attorney present. Exh. 81. Lindsay reported that he had undergone blood tests after the spitting incident, but maintained: "I have no trouble trying the case, no trouble at all." *Id.* at 7.

Then at a status hearing on January 23, 2009, Birch again complained that Lindsay was not communicating with him, had not filed certain motions or conducted certain investigation. Exh. 93.

Lindsay responded:

> And, your Honor, just for the record, I've never threatened him personally. And I would like the Court to know that I'm not the first lawyer he's had that he's made allegations that turned out not to be correct.
>
> . . . .

7

I stand ready [to] help him with a plea . . . . It's important to know, he's personally attacked me, he's hepatitis C. I need it on the record. I've been to the doctor a few times. I've already had my blood drawn a few times. I've been told the wonderful news that the incubation period for that stuff is six months to six years and nobody really knows.

So when I tell them that I won't forget what he did to me, I'm trying to let him know that it's completely unacceptable behavior. He's trying to infect me. And it's not just rude, it's truly criminal.

. . . .

But he needs to know there are consequences to this little theatrical stuff he's pulling. I intend to defend him as vigorously as possible given the circumstances . . . . and I intend to do as good a job as I possibly can on behalf of my client in spite of the fact that he's done everything he can to personally offend me and personally offend my children and all of the rest of it, your Honor.

. . . .

I've been up to the jail numerous times. He refuses to see me. There's nothing I can do about that, and that is not the consequence of my actions. Just for the record, I have been there, I have been sitting with the files, I've been ready to talk to him, and he's basically called me every name he can think of.

. . . .

Anyway, I stand ready to do everything a defense lawyer can do for this man.

*Id.* at 11-14.

When the Sears trial commenced on Monday, January 26, 2009, Birch asked for a continuance. Exh. 97. He stated that Lindsay did not come to discuss the trial with him over the weekend and that they had not discussed his defense until that morning. Exh. 97, p. 7. Notably, Birch also admitted that he had previously refused to meet with Lindsay and that Lindsay had never threatened him. *Id.* at 9, 12.

Lindsay stated that Birch had refused to meet with him the previous Thursday and had never given him the name of any potential witness. *Id.* at 10. The court denied the motion for a continuance. *Id.* at 13. Lindsay again asserted that he had "the ability to professionally and vigorously defend [Birch] in front of a jury." *Id.* at 11.

After a recess at the close of evidence in the Sears trial, in the presence of the jury, Birch stabbed Lindsay in the hand with a pencil, resulting in a wound that required medical attention. Exh. 98, pp. 240, 245-246. The judge ordered Birch removed from

the courtroom.  About four hours later, outside the presence of the jury, Lindsay maintained:  "I believe I can remove my personal feelings from my professional responsibilities.  And I can guarantee you, I'm going to do it.  I'm going to give him the best closing I possibly can given the circumstances of this case."  *Id.* at 243.

During his closing argument, Lindsay repeatedly reminded the jury that its duty was to consider only the facts of the case and that it was improper to consider or even mention or discuss Birch's restraints or his conduct in court.  *Id.* at 259-266.  Lindsay then represented Birch at the Ford truck trial, which began the day after the Sears trial concluded.

Petitioner urges that the Nevada Supreme Court overlooked this claim on appeal, and therefore, it is now subject to *de novo* review (ECF No. 71, p. 34; ECF No. 98, pp. 4-8).  Even under *de novo* review, however, ground 1 fails.

The court has difficulty imagining how petitioner could have made it more difficult for any attorney to zealously represent him.  However, petitioner cannot demonstrate that Lindsay had an "actual conflict," that is, that the conflict between Lindsay and his client affected Lindsay's performance.

The evidence presented at the two trials demonstrated the following:  Reno police officers surveilled Birch at Walmart on the day in question.  Exh. 97, pp. 99-110; 145-152; 156-166; 169-173.  They observed him going in and out of Walmart with white bags.  He eventually placed a bag in the back of a Ford pickup truck.  Officers observed Birch take white plastic bags out of the truck and then take the bus to Meadowood Mall.  He entered Sears, left the bags at the customer service counter and proceeded to the hardware department.  *Id.*  He was then monitored on Sears' video surveillance.  *Id.* at 114-142.  The prosecutor played several segments of the surveillance video for the jury.  A Sears employee testified that he and a police officer observed Birch via video spend about one and one-half to two hours walking the aisles in the tool section.  The employee testified that it appeared to him from watching the surveillance camera that

Birch placed some tools into his jacket pockets. Birch made no purchases. Officers stopped Birch after he exited the store. They brought him back into Sears where they discovered six or seven wrenches and a pair of pliers in his jacket pockets. The Sears employee identified the items as Sears property by their UPC codes. *Id.* Officers arrested Birch and brought him to the station for questioning. *Id.* at 183. Officer Clint Bellamy read Birch the *Miranda* warnings. *Id.* at 184-188. Bellamy testified that Birch agreed to talk to police, and during the interview he stated that he steals to support his drug habit. *Id.* at 189. During the approximately one and one-half hour interview, Birch never denied stealing the tools. *Id.* at 190.

In his closing argument, Lindsay reminded the jury that it was their duty to disregard Birch's conduct in the courtroom and his physical restraints. Exh. 98, pp. 66-73. He argued that the surveillance videos did not clearly show a theft and that several police officers testified that they did not see Birch steal any items. He pointed out that officers testified that Birch had a wallet on him containing $1.27 and no credit or debit cards, but no wallet was in the evidence inventory. *Id.*

With respect to the Ford truck trial, the evidence presented at trial demonstrated the following:

A Washoe County sheriff deputy and a Reno police officer both testified that they were part of the surveillance team that observed Birch going in and out of stores in a Walmart shopping center on February 21, 2008. Exh. 105, pp. 111-123; 134-146. They watched Birch place a white plastic shopping bag in the bed of a red Ford pickup truck with a snow plow on the front. They later saw Birch retrieve two shopping bags from the truck bed. On February 22, 2008, the truck was reported stolen. The deputy filled out a property receipt and checked the keys that were in Birch's secured property out of the property room. He took the keys down to the Ford truck, which was still in the Walmart shopping center. Of the two Ford keys, one unlocked the driver's door and the other turned the ignition. The truck did not start as the battery was dead. *Id.*

10

Robert Wilson testified that on February 22, 2008—the day after Birch was arrested—he discovered that his Ford pickup plow truck was missing from where it had been parked in Douglas County. Exh. 105, pp. 96-108. Wilson stated that he had one set of keys for the truck and that the keys had been left in the truck under the floor mat. He had last seen the truck on February 20th. In response to a call from Reno police officers, Wilson met them at a Reno shopping mall where his Ford truck was parked and gave him the keys. Wilson testified that he had never seen Birch prior to this case and that Birch did not have permission to drive or possess the truck. *Id.*

Lindsay successfully moved for severance of the trials. At a break early in the Sears trial, Lindsay reported to the court that he and his client were communicating and working very well together and that he had two potential witnesses he would interview. Exh. 97, pp. 143-144. On cross-examination he elicited testimony from police officers that they did not know what items were in Birch's bags or otherwise in his possession prior to Birch entering Sears. Exh. 97, pp. 141-142, 153. On cross examination, the Sears employee acknowledged that if the tools had been purchased, the UPC would scan in the same manner. *Id.* at 142.

With respect to the Ford truck trial, Lindsay elicited testimony by Wilson on cross examination that he did not see who took the truck and did not know exactly when the truck was taken. Exh. 105, p. 106. Lindsay elicited testimony from the officers that they never saw Birch open the doors of the truck or drive the truck, that they did not know how the truck got to the shopping center, and that when Birch left the shopping center he took two buses to get to Meadowood Mall. Exh. 105, pp. 124-125; 167-168. Under questioning from Lindsay, one officer conceded that Birch could have been telling the truth that his friend drove the truck to the parking lot and could have appeared evasive in his answers because he did not want to get his friend into trouble. *Id.* at 169-171.

After the jury instructions were settled, Birch asked to be allowed to leave the courtroom for closing arguments. Exh. 106, pp. 196-197. In his closing argument,

Lindsay pointed out every unusual and potentially inconsistent fact. *Id.* at 211-221. He argued that it was odd that Birch placed bags in the truck bed instead of inside the cab and that such action was inconsistent with having actual or constructive possession of the truck. He pointed out that no evidence was presented regarding who drove the truck to the Walmart parking lot or that the battery was dead on the day Birch was arrested. *Id.*

At sentencing, the court first considered the sentences for the underlying convictions. Exh. 111, p. 12. Lindsay argued that the Sears theft and possession of a stolen vehicle were probably the smallest and least egregious felonies for which he has gone to trial in his thirty-six-year career. *Id.* at 12-15. He acknowledged that Birch goes out of his way to "aggravate the system," but urged the court to step back and remember the convictions are for "very small things." He pointed out that the truck and the Sears items were returned, thus all victims were made whole. He also noted Birch was fifty-two-years-old when he argued that the court should not to sentence him to the maximum term. *Id.*

With respect to the habitual criminal determination, the prosecution submitted certified copies of six prior felony convictions for Birch. *Id.* at 22-33. The prosecutor discussed Birch's consistent criminal history over thirty-five years, with thirty-three total convictions and eleven felonies. He pointed out that any large gaps in arrests for Birch occurred when he was serving prior prison terms. He introduced letters that Birch wrote when he was in custody on the Sears and Ford truck charges to some of the police officers involved. In the letters Birch taunted the officers, telling him he needs to steal and daring them to catch him. *Id.*

In response, Lindsay urged the court that the underlying sentences that the court had already imposed were severe and that Birch was already facing incarceration until about age seventy. *Id.* at 35-38. He argued that Birch may conduct himself quite differently at age seventy-years-old. He then argued that if the court was inclined to

12

adjudicate Birch a habitual criminal that the court should sentence him to five to 20 or ten to 25 years.  *Id.*

Birch then had an opportunity to address the court.  *Id.* at 38-39.  He stated that it is impossible to prove that someone is beyond rehabilitation.  He concluded by stating that Lindsay "did a fine job.  I apologize for disrespecting the courtroom, him and everybody else . . . ."  *Id.* at 39.  The court then adjudicated Birch a habitual criminal and sentenced him to life in prison without the possibility of parole.  *Id.* at 43.

In ground 1 of this petition, Birch has failed to demonstrate that Lindsay had an "actual conflict" –that is, that the conflict between Birch and Lindsay affected Lindsay's performance.  As set forth above, Lindsay strove to highlight the gaps in evidence at both trials.  First, he argued and won a motion to sever the trials.  With respect to the Sears trial, on cross examinations he elicited testimony that no one knew what items Birch had on his person when he entered Sears and that the UPC codes on the items would have scanned in the same manner whether Birch paid for them or not.  He argued and lost a motion to suppress Birch's statement to an officer "I steal to support my habit."  Exh. 97, pp. 73-82.  During closing arguments Lindsay made the best of a difficult situation.  He could not undo what the jury had witnessed earlier that day—Birch stabbing him in the hand with a pencil.

With respect to the Ford trial, on cross examinations Lindsay elicited testimony that no witnesses observed Birch drive the truck to the parking lot, or drive it at all, or enter the truck's cab; no one could testify as to how the truck got to the parking lot or whether the battery was dead on the day Birch was arrested.  In his closing argument, Lindsay urged that Birch's actions that day, including never opening the truck doors or entering the vehicle and taking two buses to Meadowood Mall, meant the jury could not find Birch guilty beyond a reasonable doubt.

Lindsay also had an uphill battle at sentencing.  Petitioner's references to mitigating evidence that Lindsay failed to present are disingenuous.  Birch was

13

evaluated and deemed competent by two psychiatric examiners.  Birch mentioned at the sentencing hearing that he has cirrhosis of the liver; this single reference is the only mention of any medical condition.  Lindsay emphasized at sentencing that his client was older and facing potentially the remainder of his life in prison even with the minimum terms that could be imposed.  Nothing in the record suggests that the conflict between petitioner and Lindsay affected Lindsay's performance.

Similarly, the trial court did not err in denying petitioner's requests for yet another attorney.  Birch stated that he wanted to be represented by counsel, yet not only did he not make meaningful attempts to foster a meaningful attorney-client relationship, he actively antagonized and even threatened the three attorneys who were appointed in turn to represent him as well as the first trial judge on the cases.  Two psychological examiners found him mentally competent.  Petitioner's actions were a repeat and continuance of his obstreperous pattern of behavior with every attorney who tried to represent him. The second trial judge made a reasoned, balanced calculation to safeguard Birch's right to a speedy resolution to his cases in light of Birch's well-established pattern of refusing to work with counsel.  Birch consistently worked to sabotage his defense, and the trial court afforded him what the Sixth Amendment requires.  Birch has failed to demonstrate either that in spite of his objection, the trial court failed to allow him the opportunity to show that potential conflicts impermissibly imperiled his right to a fair trial, or that an actual conflict of interest—one that affected Lindsay's performance—existed.  *Cuyler*, 446 U.S. at 348.  Accordingly, federal habeas relief as to ground 1 is denied.

### Ground 5

Birch claims that the trial court violated his Sixth and Fourteenth Amendment right to self-representation when it failed to hold a hearing pursuant to *Faretta v. California* when Birch requested to represent himself (ECF No. 71, pp. 45-47).

Criminal defendants have a Sixth Amendment right to self-representation at trial. *Faretta v. California*, 422 U.S. 806, 818-819 (1975). However, while the Sixth Amendment right to counsel attaches unless affirmatively waived, a defendant must assert the right to self-representation. *Sandoval. v. Calderon*, 241 F.3d 765, 774 (9th Cir. 2001) (internal citation omitted). The Ninth Circuit Court of Appeals has stated that if a "defendant's request to proceed *pro se* is timely, not for the purposes of delay, unequivocal, voluntary, intelligent and the defendant is competent, it must be granted." *U.S. v. Maness*, 566 F.3d 894, 896 (9th Cir. 2009). In *Faretta*, the Court held that a request made "weeks before trial" was timely. 422 U.S. at 835; *see also Marshall v. Taylor*, 395 F.3d 1058, 1061-1062 (9th Cir. 2005) (denying habeas relief when the defendant made his request to represent himself on the day trial was to start).

As recounted above, Lindsay was Birch's third attorney in these matters. On Monday, January 26, 2009, the first day of trial in the Sears case, Birch made a lengthy statement to the court. Exh. 97, pp. 7-9. He complained that Lindsay did not visit him the weekend before the trial. He claimed that an investigative report missing from his file would show that he had a wallet with credit cards in it when he was arrested. He argued that he was never provided an investigator, that Lindsay was overlooking the real issue of whether he intended to steal, and that he was being framed. In the middle of his statements, Birch said: "I'm not capable of representing myself. I would like to represent myself, but I'm not capable at this point. And I know you're not [sic] going to say no, but I would like a couple of weeks, I'll represent myself." *Id*. at 8. Birch acknowledged that he had refused to see Lindsay in the past. *Id*. at 9. Birch then continued asserting that he had money in his wallet when he was arrested and that the issue was whether he had intent to steal. He concluded by asking the judge to either continue trial so that he and Lindsay could "come to terms" or so that he could represent himself. *Id*.

15

Lindsay then discussed with the court—and Birch agreed—that Birch refused to see Lindsay right up to the Friday prior to trial. *Id.* at 11-12. Birch finally asked the court "Can I get a continuance? Can I get rid of Mr. Lindsay?" *Id.* at 13. The court denied the motion to continue and denied the motion to recuse Mr. Lindsay. *Id.* The court addressed other preliminary matters, and then jury selection began.

In affirming the denial of this claim, the Nevada Supreme Court reasoned that "[e]ven if this comment can be construed as a waiver of his right to counsel," the record reflects that the trial court did not err in summarily rejecting Birch's request because it was untimely and made for the purpose of delay. Exh. 163, p. 6.

As set forth in the discussion of ground 1, Birch engaged in a pattern of disruptive, threatening and even dangerous behavior, including refusing to work with a series of appointed counsel, personally threatening counsel and the trial judge, leaving profane telephone messages with the Public Defender's office, and spitting in Lindsay's face and eye. The right to self-representation does not attach until asserted. *Sandoval*, 241 F.3d at 774. The Nevada Supreme Court pointed out that Birch did not necessarily make an unequivocal request to represent himself. It then reasonably concluded that, based on the entire record, any such self-representation request was untimely and made for the purpose of delay, and therefore, the trial court did not err in summarily denying the request. Birch has failed to demonstrate that the Nevada Supreme Court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 5.

**b.  Sufficiency of the Evidence and Police Interview Claims**

**Ground 4**

Birch contends that his Fifth and Fourteenth Amendment due process rights were violated because insufficient evidence supported the guilty verdict in both trials (ECF No. 71, pp. 41-45).

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)).  On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.  "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  On habeas review, this court must assume that the trier of fact resolved any evidentiary conflicts in favor of the prosecution and must defer to such resolution.  *Id.* at 326.  Generally, the credibility of witnesses is beyond the scope of a review of the sufficiency of the evidence.  *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

The Nevada Supreme Court affirmed the denial of this claim with respect to the Sears trial, reasoning:

> The evidence adduced at trial shows that Birch entered a Sears store, knelt down beside a tool display, and exited the store with several wrenches and a pair of pliers in his pocket.  We conclude that this evidence was sufficient for a rational juror to find beyond a reasonable doubt that Birch entered the Sears store with the intent to commit larceny. *See Jackson*, 443 U.S. at 319; *McNair*, 108 Nev. at 56, 825 P.2d at 573; NRS 205.060(1).

Exh. 163, p. 6.

As discussed in relation to ground 1, the prosecution presented the following evidence:  a Sears employee testified at trial that he observed Birch via video surveillance:  "over the course of an hour and a half to two hours, [Birch] selected

several wrenches and proceeded to conceal them on his person." Exh. 97, p. 129.  The

employee testified that Birch made no purchases.  *Id.* at 140.  Officers testified that

Birch was apprehended upon exiting the store and was in possession of several Sears

tools.  *Id.* at 136.  Officers testified that Birch was not carrying any sufficient form of

payment to purchase tools at the time of his arrest.  *Id.* at 163.  Officer Bellamy testified

that after receiving *Miranda* warnings Birch admitted he stole to support his drug habit

and affirmatively acknowledged his guilt with respect to the Sears theft.  *Id.* at 189-190.

Birch argues the evidence is insufficient because no witness personally observed

him steal anything, the surveillance videos do not ever show Birch concealing tools on

his person, the fact that police lost Birch's wallet was suspicious, and no evidence was

presented to show Birch had the intent to steal when he entered Sears (ECF No. 71, p.

43).

Respondents point out that, in Nevada, intent to commit burglary can be

established by direct or circumstantial evidence.  *Moore v. State*, 126 P.3d 508, 513

(Nev. 2006).  Viewed in the light most favorable to the prosecution, a rational juror could

have reasonably concluded that the State presented sufficient evidence to find Birch

guilty beyond a reasonable doubt.  *Jackson*, 443 U.S. at 324.  Petitioner has failed to

demonstrate that the Nevada Supreme Court's decision is contrary to, or involves an

unreasonable application of, clearly established federal law, as determined by the U.S.

Supreme Court, or was based on an unreasonable determination of the facts in light of

the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal

habeas relief is denied as to Birch's claim that insufficient evidence supported the

verdict in the Sears case.

With respect to the Ford truck trial, the Nevada Supreme Court affirmed the

denial of this claim as follows:

> The evidence adduced at trial shows that Birch placed one
> shopping bag into the bed of a pickup truck and later retrieved two bags
> from the bed of the truck.  Further, when he was searched incident to an
> arrest on other charges, keys fitting the truck were discovered on his

person.  In addition, the owner testified that he reported the truck stolen and had not given Birch permission to use it.  We conclude that this evidence was sufficient for a rational juror to find beyond a reasonable doubt that Birch possessed the truck with reason to believe it had been stolen.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992); NRS 205.273(1)(b).

Exh. 163, pp. 2-3.

As discussed in relation to ground 1, the prosecution presented the following evidence:  police officers testified that they observed Birch going in and out of stores in a Walmart shopping center on February 21, 2008.  Exh. 105, pp. 111-123; 134-146.  They watched Birch place a white plastic shopping bag in the bed of a red Ford pickup truck with a snow plow on the front.  They later saw Birch retrieve two shopping bags from the truck bed.  When Birch was detained in relation to the Sears theft, he was evasive when questioned about the owner of the truck.  *Id.* at 152-153.  On February 22, 2008, the truck was reported stolen.  *Id.* at 111-123; 134-146.  A deputy checked out the keys that were in Birch's secured property and verified that they opened the truck and turned the ignition.  The truck did not start as the battery was dead.  *Id.*

Robert Wilson testified that he discovered his Ford pickup plow truck was missing on February 22, 2008—the day after Birch was arrested—and reported the theft.  Exh. 105, pp. 96-108.  In response to a call from Reno police officers, Wilson met them at a Reno shopping mall where they gave him the Ford truck keys.  Wilson had to jump-start the truck.  Wilson testified that he had never seen Birch prior to this case and that Birch did not have permission to drive or possess the truck.  *Id.*

Birch argues that insufficient evidence supported his conviction because no evidence was presented that he ever entered or drove the truck, knew that it was stolen or had an opportunity to steal a truck in Douglas County (ECF No. 71, p. 45).

Respondents point out that, in Nevada, "possession" includes constructive possession:  "the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.  *Palmer v. State*, 920 P.2d 112, 115 (Nev. 1996).  Viewed in the light most favorable to the prosecution, a

rational juror could have reasonably concluded that the State presented sufficient evidence to find Birch guilty beyond a reasonable doubt.  *Jackson*, 443 U.S. at 324.  Petitioner has failed to demonstrate that the Nevada Supreme Court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is denied as to Birch's claim that insufficient evidence supported the verdict in the Ford truck case.  Thus, ground 4 is denied in its entirety.

### Ground 6

Birch asserts that the prosecutor's presentation of testimony regarding Birch's silence during a police interview and the prosecutor's assertion in closing argument that such silence evidenced Birch's guilt violated his Fifth and Fourteenth Amendment rights to remain silent (ECF No. 71, pp. 47-49).

In *Doyle v. Ohio*, the United States Supreme Court held that "the use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. 426 U.S. 610, 619 (1976).  The Court subsequently clarified that a defendant may be examined at trial about prior statements made voluntarily after receiving *Miranda* warnings that are inconsistent with his trial testimony.  *Anderson v. Charles*, 447 U.S. 404, 408 (1980).  In *Anderson*, the defendant told police, after receiving *Miranda* warnings, that he stole a car from a certain location.  *Id.* at 406.  At trial, the defendant testified to a different version of events, including asserting that he took the car from a different location.  *Id.*  The Court reasoned that "*Doyle* does not apply to the facts of this case.  Each of two inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version.  But *Doyle* does not require any such formalistic understanding of silence."  *Id.* at 409.

The Ninth Circuit has also explained that the prosecution "may properly point out inconsistencies between a defense presented at trial and a statement given after arrest. *U.S. v. Hoac*, 990 F.2d 1099 (9th Cir. 1993) (citing *U.S. v. Ochoa-Sanchez*, 676 F.2d 1283, 1286 (9th Cir. 1982). The court of appeals has also stated that this rationale applies even when the defendant does not testify at trial. *Hoac*, 990 F.2d at 1104; *Klepper v. United States*, 331 F.2d 694, 701 (9th Cir. 1964). Further, that court has concluded that a "non-answer to a question did not constitute either a total or selective revocation of [the defendant's] earlier waiver of Fifth Amendment rights . . . and it was thus not error to allow testimony to that event." *United States v. Lorenzo*, 570 F.2d 294, 297-298 (9th Cir. 1978) (cited with approval in *U.S. v. Caruto*, 532 F.3d 822, 829 (9th Cir. 2008).

The Nevada Supreme Court affirmed the denial of this claim:

> Birch argues that the district court erred in admitting . . . evidence that during his police interview Birch did not deny culpability or profess his innocence . . . . We conclude that this argument lacks merit. As Birch waived his right to remain silent and spoke with detectives, the State's questions concerning his failure to deny the charges did not constitute improper comment on his right to remain silent. *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) (providing that questioning about prior inconsistent statements does not improperly comment on right to remain silent because defendant was not induced to remain silent by warnings); *see also Maginnis v. State*, 93 Nev. 173, 175, 561 P.2d 922, 923 (1977) (providing that defendant's failure to speak or equivocation in the face of accusation of having committed crime may be offered as implied admission of guilt).

Exh. 163, p. 7.

Officer Bellamy testified at trial that he gave Birch a form that set forth the *Miranda* warnings. Exh. 97, pp. 185-190. Birch initialed after each section, wrote "yes" in answer to the question "do you understand each of these rights?" and wrote "yes" in answer to the question "having these rights in mind, do you wish to talk to us now?" Bellamy testified that Birch then told him that he steals to support his drug habit. Bellamy testified that the other officer present asked Birch if he understood that the

police had him "dead bang" on Sears and that Birch responded affirmatively.  He testified that at no time during the approximately ninety-minute interview did Birch deny culpability.  *Id.*

During closing arguments, the prosecutor pointed out that Birch signed the waiver of his *Miranda* rights.  Exh. 98, p. 64.  The prosecutor stated that Birch had acknowledged it when the officers told him they had him "dead bang" on Sears.  *Id.*

This court concludes that this claim lacks merit.  The record reflects that Birch knowingly and voluntarily waived his *Miranda* rights and then proceeded to speak to police detectives for about ninety minutes.  Even if there can be some dispute as to whether Birch responded in some manner in the affirmative or in agreement to a detective's statement that the police had Birch "dead bang" on Sears, testimony regarding his failure to answer a specific question in the course of an extended interview is not a comment on his invocation of his Fifth Amendment rights and is not improper.  Birch has failed to demonstrate that the Nevada Supreme Court's affirmance of the denial of this claim is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is denied as to ground 6.

### c.      Physical Restraints and Exclusion Claims

**Ground 2**

Here, Birch claims that his Fifth and Fourteenth Amendment rights to due process were violated when he was forced to appear at trial in physical restraints and a spit hood (ECF No. 71, pp. 35-38).

A criminal defendant has Fifth and Fourteenth Amendment due process rights to be free from physical restraints that are visible to the jury.  *Deck v. Missouri*, 544 U.S. 622, 628-629 (2005).  However, a trial court may make a determination that state

interests such as "physical security, escape prevention, or courtroom decorum"

necessitate further restraint in a particular instance. *Id.* The United States Supreme

Court has emphasized that trial courts confronted with consistently disruptive, defiant

defendants "'must be given sufficient discretion to meet the circumstances of each

case.'" *Stewart v. Corbin*, 850 F.2d 492 (9th Cir. 1988), quoting *Illinois v. Allen*, 397 U.S.

337, 343-344 (1970).

     The Nevada Supreme Court denied this claim with respect to the Ford truck case

as follows:

> First, Birch argues that the use of visible physical restraints and a
> spit hood violated his right to a fair trial. Birch, who admitted that he had
> Hepatitis C, had spat in his counsel's face during a pretrial hearing.
> Further, he stabbed his counsel in the hand during a prior trial. Therefore,
> we conclude that the district court did not abuse its discretion in this
> regard. *See Hymon v. State*, 121 Nev. 200, 207, 111 P.3d 1092, 1098
> (2005).

Exh 163, p. 2. The Nevada Supreme Court also denied this claim with respect to the

Sears case, referring to its discussion above with respect to the Ford truck case. *See*

*id.* at 4.

     During the Sears trial, the trial court made the following factual findings and

conclusions of law concerning the physical restraints and Birch's ultimate removal from

the courtroom:

> . . . [T]he Court finds as a matter of fact that, one, the defendant has been
> charged with the felony of burglary. An amended information has charged
> him with being an habitual criminal. Two, on January 9th, 2009, in his
> court appearance, defendant spit at his attorney, Bruce R. Lindsay, and
> was removed from the courtroom. On or about January 12, 2009, this
> Court was informed that the defendant admitted he was positive for
> hepatitis C viruses.
>
> Four, that based upon the defendant's admission, this Court ordered that
> the defendant be fitted with a spit hood and restrained during all further
> court proceedings. The Court did that to protect court personnel and the
> public during the defendant's appearances in court.
>
> Five, that on or about January 14th, 2009, defendant appeared in Court
> and informed the Court he was on suicide watch at the Washoe County

Jail. Based upon the defendant's own admission, it appeared to the Court that he was a danger of self-destruction and, therefore, restraint was appropriate.

Six, based upon his prior assaultive behavior, his admission that he was carrying a communicative disease and he was on suicide watch and, therefore, a danger to his attorney, the court staff, the public and himself, this Court ordered that the defendant be restrained during his trial on the burglary charge.

Seven, that despite such restraints, on January 27th, 2009, after the jury had been seated to hear jury instructions and closing arguments, the defendant produced a sharp instrument and attacked his counsel inflicting a wound, which required a recess of court proceedings and the transfer of counsel to Renown Hospital for immediate treatment.

. . . [discussing Nevada contempt statutes].

Therefore, the Court finds the defendant has acted in a contemptuous manner in violation of the ordinar[]y administration of justice in these proceedings.

Two, that this Court has considered all measures necessary to ensure the safety of court personnel, counsel and the general public while attempting to use the least restraint necessary in providing the defendant with the opportunity to participate in a speedy, public and fair trial.

And, three, based upon his actions, the defendant is hereby found in contempt of court and has therefore forfeited his right to participate in further court proceedings.
. . .

The Court finds that alternative means of providing for Mr. Birch's participation through video or audio would not produce a timely resolution of this matter, and, therefore, in this Court's discretion, I will decline to order that video or audio participation be provided to Mr. Birch in his trial.

Exh. 98, pp. 244-48. The trial court had also noted that it was 3:00 pm and the jury had

been in recess since 11:30 that morning (while Lindsay received medical attention for

his hand). The court observed that Birch had been present at all of the trial

proceedings, including the presentation of evidence and the settling of jury instructions

and was also canvassed about his right to testify. *Id.* at 244. The court concluded that

closing argument was not a critical stage of the proceedings and that Birch's absence

did not violate his constitutional rights. *Id.*

At the Ford truck trial, the trial court repeated these findings and further clarified that, in the Sears trial, "[t]he Court restrained only [Birch's] hands to prevent his hands from reaching up and removing the hood . . . . The Court did not order his legs to be shackled." Exh.104, p. 22.  The record reflects that during the Ford truck trial, Birch was "shackled, his legs are shackled, his hands are shackled and his hands are restrained in front of his body by a black box handcuff and he is wearing a spit hood." *Id.* at 21; *see also id.* at 24 (finding no reasonable alternatives to these measures to ensure courtroom security).

The trial court also instructed the jury in each case that: "[t]he defendant has been placed in restraints and has worn a hood during the course of this trial.  This was done upon the order of this court.  This should not be considered by the jury in arriving at a verdict."  Exh. 99, p. 9 (Instruction No. 17A); Exh. 108, p. 19 (Instruction No. 18).

The state district court's factual findings are entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).  The state district court laid out detailed factual findings—set out above—and then weighed Birch's right to be present, his right to a speedy trial, his conduct, his future threatened conduct, and the need for safety and security for all court personnel.  Birch has failed to demonstrate that the Nevada Supreme Court's affirmance of the denial of this claim is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is denied as to ground 2.

### Ground 3

Birch asserts that his Fifth, Sixth and Fourteenth Amendment rights to trial by jury, confrontation, and due process were violated when he was excluded from participation in peremptory challenges and from closing arguments in the Sears case and from a "read back" conducted in the Ford case (ECF No. 71, pp. 38-41).

"The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment." *U.S. v. Gagnon*, 470 U.S. 522, 526 (1985).  However, a defendant has a Fourteenth Amendment due process right to be present in some situations where he or she is not confronting witnesses or evidence against him or her.  *Id.*  A defendant has the right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).  That is, a defendant has the right to present when his presence reasonably, substantially relates to his opportunity to fully defend against the charge.  *Id.*  The Court has also cautioned that "the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only," (*Snyder v. Massachusetts*, 291 U.S. 97, 105-106 (1934); *see also Faretta v. California*, 422 U.S. 806, 819, n. 15 (1975)), and that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record.  *Snyder*, 291 U.S., at 115.  A defendant may, by disruptive behavior, forfeit or waive his right to be personally present during proceedings. *Illinois v. Allen*, 397 U.S. 337, 342-343 (1970).

The Nevada Supreme Court denied these claims, reasoning that Birch had no unlimited right to be present at every proceeding and that he had failed to demonstrate prejudice.  Exh. 163, pp. 3, 5-6.

With respect to the Sears trial, Lindsay was present at the conference discussing peremptory challenges, and he delivered the closing arguments.  Exh. 97, pp. 61-95; Exh. 98, pp. 66-74.  With respect to the Ford truck trial, a juror sent the court a note requesting a transcript or video of one of the police detective's testimony.  Exh. 106, pp. 50-51.  The court conferred with counsel and counsel approved of the court's response to the juror.  The court then responded by informing the juror that no such transcript or video existed, and therefore, the jury would have to rely on its own notes and recollections.  *Id.*

This court agrees with respondents that the Nevada Supreme Court did not unreasonably apply Supreme Court precedent in denying these claims.  First, the court notes that Birch himself requested to leave the courtroom and not be present for the closing arguments in the Ford truck case.  Exh. 106, p. 20.  Thus, he was not present when the issue of the juror's request for a transcript or video of testimony surfaced and was discussed by the court and counsel immediately before closing arguments.  *Id.* at 50-51.  Further, Birch forfeited his right to be present during trial by his disruptive and dangerous behavior—particularly after the point at which he stabbed Lindsay in the hand with a pencil before the closing arguments in Sears.  Moreover, the Nevada Supreme Court did not unreasonably conclude that Birch failed to demonstrate that he suffered prejudice.  Birch's vague allegations that he could have provided input and that the outcomes might have been different do not demonstrate that his absence had a substantial or injurious effect or influence in the jurys' deliberations.  Federal habeas relief is denied as to ground 3.

#### d.      Remaining Claims

### Ground 7

Birch claims that his sentences of concurrent terms of life in prison without the possibility of parole for the Sears and Ford truck matters is excessive and constitutes cruel and unusual punishment in violation of the Eighth Amendment and violated his Fifth and Fourteenth Amendment due process rights (ECF No. 71, pp. 49-52).  Specifically, Birch asserts that 1) the sentencing judge erroneously found that his offenses were recent; 2) his sentences are grossly disproportionate to his crimes; and 3) the jury should have conducted the sentencing analysis.  *Id.* at 50-52.

Under Nevada law, if a person is convicted of a felony has three previous felony convictions, the district court may sentence the person as a habitual criminal.  NRS 207.010(b).  The potential sentences include life without the possibility of parole.  *Id.*

With respect to the Ford truck case, the Nevada Supreme Court affirmed the

denial of this claim:

> Having found at least three prior felony convictions, the district
> court adjudicated Birch a habitual criminal.  The sentence imposed is
> within the statutory limits, *see* NRS 207.010(1)(a), and Birch has not
> alleged that the sentencing statutes are unconstitutional.  We conclude
> that the sentence imposed is not grossly disproportionate to the offense
> for the purposes of the constitutional prohibitions against cruel and
> unusual punishment.  *See Blume v. State*, 112 Nev. 472, 475, 915 P.2d
> 282, 284 (1996); *Harmelin v. Michigan*, 501 U.S. 957, 1000-01 (1991)
> (plurality opinion).  We further conclude that Birch failed to demonstrate
> that the district court punished Birch for his behavior in court or otherwise
> abused its discretion in sentencing him.  *See Houk v. State*, 103 Nev. 659,
> 664, 747 P.2d 1376, 1379 (1987).

Exh. 163 at 4. The Nevada Supreme Court denied this claim with respect to the Sears

case for the same reasons. *See id.* at 5-6.

At the sentencing hearing, the State introduced certified copies of six prior

felonies.  Exh. 111, pp. 23-24.  The presentencing report reflects 33 convictions,

including 11 felony convictions.  Exh. 191, p. 2.[2]  The report concludes:

> Appearing before the Court is a man who began his adult criminal
> life in 1974 and has continued essentially without interruption to date.  At
> 53 years of age the defendant has amassed an extensive criminal history.
> As a result, he has spent an inordinate amount of time in prison and/or jail
> for various theft and violent related offenses.  There is little doubt that the
> defendant is a habitual criminal who is a drain on society and it[]s assets.
>
> He has further been afforded the opportunity to participate in periods of
> community supervision, some of which he was unable to complete
> successfully.  It is unlikely that anything that the Division of Parole and
> Probation could offer, or any leniency granted by the Court, would
> motivate the defendant to stop committing criminal offenses and lead a
> more pro-social lifestyle.

*Id.* at 9.  The State also introduced several letters that Birch had sent to police

detectives involved in the Sears and Ford truck cases while he was in custody on the

charges in these cases.  Exh. 111, pp. 18, 30-31.  Birch wrote one to Detective Reed

---

[2] Exhibits 191-192 are found at ECF No. 95.

Thomas, stating: "I need to go steal, Reed, I need to go steal bad and I'm going to be soon anyway.  I want to call you while I'm stealing.  I dare you to catch me stealing, Reed.  You are not good enough to catch me doing shit."  *Id.* at 30.  Birch wrote a letter to Scott Pearson in the district attorney's office, saying:  "I want to go steal, Scott, bad.  I want Reed to try to catch me again."  *Id.* at 31.

In adjudicating Birch a habitual criminal, the sentencing court stated:

> The record will reflect that I have had an opportunity to review the criminal, prior criminal history and while it is a lengthy one, it is one primarily dominated by nonviolent offenses.  However, the court did note that there was a robbery in his criminal history and other offenses involving firearms that take it beyond the economic realm. . . .  The court finds that the defendant has three prior felony convictions that pass constitutional muster.  That in his presentence investigation report, it appears that several convictions were for violent offenses.  The court finds that the offenses were recent and that it is just and proper, based upon the nature and gravity of the prior convictions to enhance the defendant's sentence pursuant to NRS 207.010.

Exh. 111, pp. 40-42.

Birch argues that it was not "just and proper" to sentence him as a habitual criminal because of "the non-violent nature of the crimes . . . and the generally stale and remote predicate felonies . . . ." (ECF No. 71, p. 51).  Specifically, Birch first argues that the trial court erred in finding that the predicate felonies were recent (ECF No. 71, p. 51).  Respondents acknowledge that those six felonies were not recent (ECF No. 94, p. 41).  However, Birch's presentence investigation report indicates that his criminal history included not only recent offenses, but also offenses that involved violence or the threat of violence, such as: a 1993 domestic violence conviction, a 1994 firearm conviction, and a 1997 robbery charge that resulted in a burglary conviction.  *See* Exh. 191, pp. 3-5.  Contrary to Birch's assertion, the sentencing court did not find that the submitted predicate felonies were recent, but that he has a lengthy criminal history, including recent offenses.

Second, within ground 7 Birch argues that his sentences are grossly disproportionate to his crimes (ECF No. 71, p. 51-52).  The Eighth Amendment forbids cruel and unusual punishment, such as "barbaric punishments," *Solem v. Helm*, 463 U.S. 277, 284 (1983), and "extreme" sentences that are "grossly disproportionate" to the crime, *Ewing v. California*, 538 U.S. 11, 23 (2003).  The Eighth Amendment does not, however, require strict proportionality between crime and sentence.  *Id.*  In *Lockyer v. Andrade*, the Supreme Court invoked a "gross disproportionality principle," the "precise contours of [which] are unclear," and which applies "only in the 'exceedingly rare' and 'extreme' case."  538 U.S. 63, 72-73 (2003)(citations omitted).  In determining whether a sentence is grossly disproportionate, the reviewing court considers the severity of the sentence, the gravity of the offense, and the defendant's criminal history.  *Taylor v. Lewis*, 460 F.3d 1093, 1098-1101 (9th Cir. 2006).  Successful challenges based on proportionality are "exceedingly rare."  *Id.* at 1098.  A long sentence may be constitutional even if the most recent offense was minor or nonviolent.  *See, e.g., Andrade*, 538 U.S. at 77; *Ewing*, 538 U.S. at 30-31; *Rummel v. Estelle*, 445 U.S. 263, 285 (1980).

The Nevada Supreme Court pointed out that Birch does not argue that his sentences are not within the statutory limits or that the sentencing scheme is unconstitutional.  The presentencing report details a lengthy criminal history that dates back to 1974.  The majority of the offenses are nonviolent, though several are violent.  Exh. 191.  Birch has not demonstrated that this is an extreme or exceedingly rare case, or that the Nevada Supreme Court's affirmance of the denial of this claim is contrary to, or involves an unreasonable application of, clearly established federal law.  Accordingly, this court denies habeas relief as to ground 7.

### Ground 8

Finally, Birch argues that he is entitled to habeas relief because of the cumulative effect of errors raised on appeal and in his federal petition (ECF No. 71, p. 52).

30

Under Ninth Circuit precedent, habeas relief may be available based on the aggregate effect of multiple errors even though the errors considered in isolation do not rise to the level of a constitutional violation.  *See Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2003).  "[C]umulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

As set forth in this order, Birch's claims of error lack merit.  In addition, the evidence establishing Birch's guilt was strong, thus the cumulative impact of any errors falls well short of rendering it fundamentally unfair.  Ground 8 is denied.  28 U.S.C. § 2254(b)(2).

Accordingly, the petition is denied in its entirety.

## IV.    Certificate of Appealability

This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

Having reviewed its determinations and rulings in adjudicating Birch's petition, the court finds that none of those rulings meets the *Slack* standard.  The court therefore declines to issue a certificate of appealability for its resolution of any of Birch's claims.

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 71) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED: 7 December 2015.

_____
GLORIA M. NAVARRO, CHIEF JUDGE
UNITED STATES DISTRICT COURT